1  JONATHAN V. HOLTZMAN (SBN 99795)
   jholtzman@publiclawgroup.com
2  JAMES R. ROSS (SBN 149199)
   jross@publiclawgroup.com
3  RYAN P. McGINLEY-STEMPEL (SBN 296182)
   rmcginleystempel@publiclawgroup.com
4  JAKE D. FREITAS (SBN 341837)
   jfreitas@publiclawgroup.com
5  MARIBEL LOPEZ (SBN 340907)
   mlopez@publiclawgroup.com
6  TAYLOR EVANS (SBN 355492)
   tevans@publiclawgroup.com
7  RENNE PUBLIC LAW GROUP
   350 Sansome Street, Suite 300
8  San Francisco, California 94104
   Telephone: (415) 848-7200
9  Facsimile: (415) 848-7230

10 *Attorneys for Plaintiffs*
   HOUSING AUTHORITY OF THE COUNTY OF
11 SAN DIEGO; HOME FORWARD; HOUSING
   AUTHORITY OF THE CITY OF LOS
12 ANGELES; LOS ANGELES COUNTY
   DEVELOPMENT AUTHORITY; HOUSING
13 AUTHORITY OF THE CITY OF SALEM;
   HOUSING AUTHORITY OF BALTIMORE
14 CITY; SAN DIEGO HOUSING COMMISSION

15 JUHI S. AGGARWAL (OSB No. 130764)*
   juhi.aggarwal@homeforward.org
16 HOME FORWARD
   135 SW Ash Street
17 Portland, OR 97204
   Telephone: 503-545-5090

18
   *Attorney for Plaintiff*
19 HOME FORWARD
   *Application for admission pro hac vice*
20 *forthcoming*

DAVID CHIU (SBN 189542)
City Attorney
YVONNE R. MERÉ (SBN 175394)
Chief Deputy City Attorney
MOLLIE M. LEE (SBN 251404)
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
RONALD H. LEE (SBN 238720)
Deputy City Attorney
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
Telephone: (415) 554-3935
Facsimile: (415) 437-4644
ronald.lee@sfcityatty.org

*Attorneys for Plaintiff*
HOUSING AUTHORITY OF THE CITY AND
COUNTY OF SAN FRANCISCO

DANIEL B. ATCHISON (OSB No. 040424)*
datchison@cityofsalem.net
THOMAS V. CUPANI (OSB No. 924654)*
tcupani@cityofsalem.net
City of Salem, Legal Department
PO Box 14300
Salem, Oregon 97309-3986
Telephone: (503) 588-6003
Facsimile: (503) 361-2202

*Attorneys for Plaintiff*
HOUSING AUTHORITY OF THE CITY OF
SALEM
*Application for admission pro hac vice*
*forthcoming*

21 MICHAEL BUENNAGEL (SBN 259000)
   MBuennagel@counsel.lacounty.gov
22 THOMAS FAUGHAN (SBN 155238)
   tfaughnan@counsel.lacounty.gov
   BEHNAZ TASHAKORIAN (SBN 213311)*
23 Btashakorian@counsel.lacounty.gov
   Office of the County Counsel
24 County of Los Angeles
   Kenneth Hahn Hall of Administration
25 500 West Temple Street #648
   Los Angeles, CA 90012
26 Telephone: (213) 974-1811
   *Application for Northern District Admission*
27 *forthcoming*

   *Attorneys for Plaintiff*
28 LOS ANGELES COUNTY DEVELOPMENT
   AUTHORITY

RENNE PUBLIC LAW GROUP
Attorneys at Law

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOUSING AUTHORITY OF THE COUNTY OF SAN DIEGO; HOME FORWARD; HOUSING AUTHORITY OF THE CITY OF LOS ANGELES; LOS ANGELES COUNTY DEVELOPMENT AUTHORITY; HOUSING AUTHORITY OF THE CITY OF SALEM; HOUSING AUTHORITY OF THE CITY AND COUNTY OF SAN FRANCISCO; HOUSING AUTHORITY OF BALTIMORE CITY; SAN DIEGO HOUSING COMMISSION, | Case No. 3:25-cv-08859 **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs,

v.

SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development; the U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,

Defendants.

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

## I.    INTRODUCTION

Plaintiffs bring this action in response to the current Administration's threats to deprive federal funding essential to their communities.  For years, Plaintiffs have relied on congressionally authorized grant programs[1] to deliver crucial housing services that connect residents to opportunity and sustain local economies.  They have endeavored to work cooperatively to administer these programs, but the lawful and predictable administration of these grants has now been upended.

The Constitution vests Congress—not the Executive—with the authority to make laws and appropriate federal funds.  *See* U.S. Const. art. I, § 8; *Cunningham v. Neagle*, 135 U.S. 1, 83–84 (1890). While the Executive Branch is charged with faithfully executing the laws enacted by Congress, that duty does not include the power to unilaterally rewrite or expand the statutory terms under which federal funds are awarded.  *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

Here, the U.S. Department of Housing and Urban Development ("HUD") has imposed vague and unauthorized conditions on federal grants to coerce compliance with executive policy preferences.  These actions exceed Defendants' constitutional and statutory authority, erode the separation of powers, and disregard core constitutional and statutory protections, including the Fifth Amendment's void-for-vagueness doctrine, the Spending Clause's unambiguous condition requirement, and the Administrative Procedure Act's ("APA") procedural safeguards.

Defendants' overbroad interpretation and enforcement of these conditions are not hypothetical.  On July 17, 2025, HUD's Office of Public and Indian Housing ("PIH") issued Notice PIH 2025-22 titled, "Public Housing Operating Subsidy Grant Eligibility Calculations and Processing for Calendar Year 2026." Notice PIH 2025-22 requires PHAs to sign a SF-424 certification that includes certifications to new conditions not included in CY 2025 and CY 2024 Operating Fund Processing Notices, and are not authorized by the statutory provisions governing the grant programs.  Plaintiffs must agree to these conditions by October 21, 2025, or face the loss of critical funding.

---

[1] Although HUD refers to the funding provided through its programs as "grants," the programs, in large part, do not administer discretionary grants in the conventional sense.  Rather, they are statutory entitlements administered pursuant to the United States Housing Act of 1937 and other related statutes, described in more detail below.

## II.    JURISDICTION

1.    The Court has jurisdiction under 28 U.S.C. § 1331.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 et seq.

2.    Venue properly lies within the Northern District of California because this is an action against an officer or employee of the United States and an agency of the United States, Plaintiff Housing Authority of the City and County of San Francisco resides in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district.  28 U.S.C. § 1391(e)(1).

3.    Divisional Assignment: Pursuant to Civil Local Rule 3-2(d), except as provided in Civil L.R. 3-2(c), all civil actions that arise in the counties of Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo or Sonoma shall be assigned to the San Francisco Division or the Oakland Division.  This action arises in part in the City and County of San Francisco.

## III.    PARTIES

4.    Plaintiff Home Forward is a public housing agency organized under the laws of the State of Oregon and created by resolution of the Council of the City of Portland.

5.    Home Forward, formerly known as the Housing Authority of Portland, relies heavily on HUD-funding to carry out public housing operations throughout Multnomah County.  For Calendar Year (CY) 2026, Home Forward has been tentatively approved to receive over $7 million annually in Operating Subsidy funding to support operations at nine public housing properties, which provide access to safe, decent housing for over 550 low-income individuals.  For Fiscal Year (FY) 2025, Home Forward received an allocation of over $1.5 million in Capital Fund Program Funding, which are used to support a range of maintenance and redevelopment projects.  Home Forward has received the Family-Self Sufficiency grant since 1996, including an award of $933,544 last calendar year.  Home Forward expects to receive a similar amount for CY 2026.  Finally, Home Forward received an allocation of $448,831 in Multifamily Housing Service Coordinators funding for FY 2025.

6.    Plaintiff Housing Authority of the County of San Diego ("HACSD") is a public housing agency organized under the laws of the State of California and created by resolution of the San Diego County Board of Supervisors.

RENNE PUBLIC LAW GROUP
Attorneys at Law

7.     HACSD relies on HUD funding to maintain and operate three public housing developments, which provide housing to low-income families, the elderly, people with disabilities, and individuals experiencing or at risk of experiencing homelessness.  For CY 2025, HACSD received an allocation of approximately $370,448 in Operating Subsidy funds, as well as $367,143 in Capital Fund program funding for FY 2025.  HACSD anticipates receiving comparable amounts for the upcoming calendar and fiscal years.

8.     Plaintiff Housing Authority of the City of Los Angeles ("HACLA") is a public housing agency organized under the laws of the State of California and created by resolution of the Council of the City of Los Angeles.

9.     HACLA relies on HUD funding to support the operation of public housing units, which provide housing for 16,686 residents.  HACLA also provides affordable housing to elderly people, individuals with disabilities, and families.  HACLA typically receives approximately $24 million in Operating Subsidy funding each calendar year.  Operating Subsidy funds provide funding for HACLA's public housing staff, as well as for routine and emergency maintenance of the 6,084 public housing units HACLA operates.  HACLA was awarded over $24.5 million in Capital Fund Program funding for FY 2025.  Based on these amounts, HACLA expects to receive similar funding amounts in Operating Subsidy funds and Capital Fund Program funding for the upcoming calendar and fiscal years.  HACLA has also received an allocation of $1.4 million in funding from the Family-Self Sufficiency program in FY 2025 and expects to receive a similar amount for the upcoming fiscal year.  These funds enable HACLA to provide services that support the self-sufficiency goals of Section 8 Housing Choice Voucher Program participants.  Finally, HACLA received an allocation of $450,000 in Multifamily Housing Service Coordinators funding for FY 2025.

10.     Plaintiff Housing Authority of the City and County of San Francisco ("SFHA") is a public housing agency organized under the laws of the State of California and created by resolution of the San Francisco Board of Supervisors.

11.     SFHA relies on HUD funding to operate its Public Housing Program, which provides housing for 646 low-income individuals throughout the City and County.  SFHA received $4 million in Operating Subsidy funding for FY 2025 and anticipates receiving $2.9 million in 2026.  Additionally,

-5-

RENNE PUBLIC LAW GROUP
Attorneys at Law

SFHA received $5.5 million in Capital Fund Program funding for FY 2025.  For FY 2025, SFHA also received $283,485.96 in Family Self-Sufficiency Program funding.  This funding supports SFHA's operation of a program that offers services to assist 144 families in achieving financial and employment goals, as well as economic self-sufficiency.

12.    Plaintiff Los Angeles County Development Authority ("LACDA") is a public housing agency organized under the laws of the State of California and created by resolution of the Los Angeles County Board of Supervisors.

13.    LACDA relies on federal funding to support housing and community development programs that assist low- and moderate-income households.  These funds allow LACDA to provide affordable housing, create suitable living environments, and expand economic opportunities for residents across Los Angeles County.  LACDA received over $12 million in Operating Subsidy funding for CY 2025, as well as over $9.5 million in Capital Fund Program funds for FY 2025.  Based on these amounts, LACDA expects to receive similar amounts in Operating Subsidy and Capital Fund Program funding for the upcoming fiscal and calendar years.  LACDA has received Family-Self Sufficiency grants in previous years and anticipates receiving an award of $976,000 in funding for the upcoming year.  Finally, LACDA has also received a Capital Fund Emergency Safety and Security Grant of $250,000 for FY 2025.

14.    Plaintiff San Diego Housing Commission ("SDHC") is a public housing agency organized under the laws of the State of California and created by resolution of the Council of the City of San Diego.

15.    SDHC relies on HUD funding to provide affordable housing for residents across the City of San Diego, including low-income families, the elderly, and people with disabilities.  For CY 2025, SDHC received $384,246 in Operating Subsidy funding to support the operating needs of public housing and affordable housing units.  For CY 2025, SDHC received $516,795 in Capital Fund Program Funding to assist with carrying out capital and management activities for its public housing projects.  Last year, SDHC received approximately $728,478 in Family-Self Sufficiency funds.  These funds support training and supportive services for families receiving federal assistance to help the families achieve self-sufficiency.  SDHC expects to receive a similar amount of Family-Self Sufficiency for this renewal application round.

RENNE PUBLIC LAW GROUP
Attorneys at Law

16.     Plaintiff Housing Authority of Baltimore City ("HABC") is a public housing agency organized under the laws of the State of Maryland and created by resolution of the Council of the City of Baltimore.

17.     For CY 2025, HABC received over $97 million in Operating Subsidy funding to support operations at nine public housing properties, which provide access to safe, decent housing for low-income individuals.  For CY 2025, HABC received over $21.5 million in Capital Fund Program funding, which is used to support a range of maintenance and redevelopment projects.  HABC has also received Family-Self Sufficiency grants in previous years, including an award of $723,367 last calendar year.  HABC anticipates filing a renewal application for CY 2026.

18.     Plaintiff Housing Authority of the City of Salem ("SHA") is a public housing agency organized under the laws of the State of Oregon and created by resolution of the Council of the City of Salem.

19.     SHA depends on HUD funding to support operations for 789 units of single-family and multifamily housing serving individuals with disabilities, families, and elderly residents.  For CY 2025, SHA received over $252,264 in Operating Subsidy funding, as well as $595,467 in Capital Fund Program funding for FY 2025.  SHA has also received Family-Self Sufficiency grants in previous years, including an award of $441,144 last calendar year.  SHA will be filing a renewal application for CY 2026, and anticipates receiving $347,607 in renewal funding.  Finally, SHA received $39,799 in funding from the Multifamily Service Coordinator program last year, and anticipates this funding to increase to $44,388 in the upcoming year.

20.     Defendant Scott Turner is the Secretary of HUD, the highest-ranking official in HUD, and is responsible for the decisions of HUD.  He is sued in his official capacity.

21.     Defendant HUD is an executive department of the United States federal government.  42 U.S.C. § 3532(a).  HUD is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

IV.    **FACTUAL ALLEGATIONS**

A.    **HUD Grant Programs**

22.     Congress established HUD in 1965 to promote the "sound development of the Nation's communities and metropolitan areas" by, among other things, administering programs that "provide

RENNE PUBLIC LAW GROUP
Attorneys at Law

assistance for housing" and "development."  Department of Housing and Urban Development Act, 1965 § 2, Pub. L. No. 89-174, 79 Stat. 667.  The HUD Secretary is responsible for all actions taken by the Department and its component offices.  *See* 42 U.S.C. §§ 3533, 3535; 24 C.F.R. Part 5.  HUD administers both competitive and formula grant programs.  Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019).  Entitlement grant programs (sometimes referred to as formula grant programs) "are awarded pursuant to a statutory formula" wherein "Congress determines who the recipients are and how much money each shall receive."  *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (cleaned up).  HUD administers grants directly and through its program offices, including the Office of Public and Indian Housing (PIH), and regional field offices.  *See* 24 C.F.R. Chapter IX (PIH-administered programs).

23.     Plaintiffs rely on millions of dollars in appropriated federal funds from HUD grant programs to provide safe, decent, affordable housing and a suitable living environment, and to increase economic opportunities for low- and moderate-income persons throughout their jurisdictions.  The programs that these grants support are extensive and essential.  These funds are used for programs like the creation and preservation of affordable rental housing, community development, capital improvements, and job training programs.  These programs enable Plaintiffs to provide essential services, including food distribution, chore assistance for homebound seniors and disabled persons, and support for children who have experienced violence or neglect.  They also support domestic violence prevention efforts that benefit low-income individuals and households.

24.     In addition to the basic needs programs discussed above, the federal funds also enable Plaintiffs to administer a range of housing-related services.  These include rental assistance, housing case management, and downpayment assistance for first-time homebuyers.  These federal programs support capital development for affordable housing to benefit low-income individuals and households, create affordable housing, provide rental assistance, and address homelessness in the region.  Together, these programs help prevent and address homelessness by providing housing opportunities to low-income residents in their jurisdictions.

RENNE PUBLIC LAW GROUP
Attorneys at Law

### 1.    Public Housing Capital and Operating Fund Grants

25.    Congress established the federal public housing program when it enacted the United States Housing Act of 1937 ("Housing Act").  As amended, the Housing Act contemplates that HUD will "make annual contributions to public housing agencies to assist in achieving and maintaining the lower income character of their projects."  42 U.S.C. § 1437c(a)(1).  A public housing agency ("PHA") is "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." *Id.* § 1437a(b)(6)(A).

26.    Congress established two sources of funds to accomplish its public housing objectives under Section 9 of the Housing Act: the Capital Fund and the Operating Fund.  42 U.S.C. § 1437g(c)(1).  The purpose of the Capital Fund is to "mak[e] assistance available to public housing [authorities] to carry out capital and management activities."  *Id.* § 1437g(d)(1).  The purpose of the Operating Fund is to "mak[e] assistance available to public housing agencies for the operation and management of public housing." *Id.* § 1437g(e)(1).

27.    The Housing Act directs the HUD Secretary to establish a formula to determine Capital Fund Program ("CFP") grant amounts for each fiscal year.  42 U.S.C. § 1437g(d)(2).  A public housing agency is eligible to receive a CFP Grant in accordance with the Capital Fund formula, which measures the existing modernization needs and accrual needs of PHAs, subject to congressional appropriations.  24 C.F.R. § 905.400(a), (b).

28.    Capital Fund Program funding enables PHAs to provide services that are essential to the function of public housing facilities and the well-being of their residents.  PHAs use Capital Fund Program funding to fund a variety of activities, including the development, financing, and modernization of public housing facilities, services supporting the safety and security of residents, as well as services promoting the economic self-sufficiency of residents.  42 U.S.C. § 1437g(d)(1).

29.    The Housing Act directs the HUD Secretary to establish a formula to determine grant amounts for each fiscal year from the Operating Fund, commonly referred to as Operating Subsidy Grants ("Operating Subsidy').  42 U.S.C. § 1437g(e)(2).  A public housing agency is eligible to receive an Operating Subsidy Grant from the Operating Fund in an amount equal to the excess of its "formula

RENNE PUBLIC LAW GROUP
Attorneys at Law

expense" over its "formula income," subject to congressional appropriations.  24 C.F.R. § 990.110(a)(2), (b)(3).

30.     Operating Subsidy grants enable PHAs to provide critical public housing services, including resources to improve housing conditions and provide housing for low-income families.  PHAs use Operating Subsidy grants to fund a variety of programs that support individuals and families, including maintenance services to ensure safe public housing facilities, supportive services for elderly and disabled residents, and public housing work programs.  42 U.S.C. § 1437g(e)(1).

**a.  Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding Capital Fund and Operating Subsidy Grant Conditions**

31.     HUD's administration of the Capital Fund and Operating Subsidy program is authorized and governed by statutory directives.  Congress has specified what activities are eligible for funding under the Operating Fund program, the formula HUD must apply in allocating grants, and program requirements HUD may require recipients agree to as conditions for receiving funds.  *See* 42 U.S.C. § 1437g.

32.     Section 9 of the Housing Act, 42 U.S.C. § 1437g, contains Congress's overarching authorization for HUD to allocate Capital Fund and Operating Subsidy grants.  Subsection (c)(1) of that section states:

> For fiscal year 2000 and each fiscal year thereafter, the Secretary shall allocate amounts in the Capital Fund and Operating Funds for assistance for public housing agencies eligible for such assistance.  The Secretary shall determine the amount of the allocation for each eligible agency[.]

33.     Section 9 of the Housing Act, 42 U.S.C. § 1437g(d)(2), provides for the HUD Secretary to establish a formula to determine Capital Fund amounts and sets forth criteria the HUD Secretary may take into account in to determine the formula.  These criteria include things like the need for a PHA to rehabilitate and modernize existing facilities, the costs of construction and rehabilitation, and the number of public housing units a PHA owns, assists, or operates, among other considerations.  *Id.* § 1437g(d)(2).

34.     Section 9 of the Housing Act, 42 U.S.C. § 1437g(e)(2), provides for the HUD Secretary to establish a formula to determine Operating Subsidy amounts and sets forth criteria the HUD Secretary may take into account to determine the formula.  These criteria include factors such as the geographic

RENNE PUBLIC LAW GROUP
Attorneys at Law

locations of the public housing projects, the incomes of families served, the number of public housing units a PHA owns, assists, or operates, among other considerations.  *Id*. § 1437g(e)(2).

35.    The Housing Act does not authorize HUD to condition Capital Fund or Operating Subsidy funding on prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

36.    Pursuant to the authority to establish formulas and funding criteria under the Housing Act, HUD has promulgated the Program rule at 24 C.F.R. part 905 (the "Capital Fund Rule"), which, among other things, sets forth additional conditions to which grant recipients must agree in the Capital Fund grant agreements they execute with HUD.  *Id*. Part 905.

37.    Pursuant to the authority to establish formulas and funding criteria under the Housing Act, HUD has promulgated the Program rule at 24 C.F.R. part 990 (the "Operating Fund Rule"), which, among other things, sets forth additional conditions to which grant recipients must agree in the Operating Fund grant agreements they execute with HUD.  *Id*. Part 990.

38.    Neither the Operating Fund Rule nor the Capital Fund Program Rule imposes any conditions on Public Housing funding related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  Congress has not delegated authority that would permit an agency to adopt such conditions.

### b.   Congress Appropriates Capital Fund and Operating Subsidy Grant Funding

39.    Funding for CFP and Operating Subsidy grants comes from congressional appropriations.

40.    Most recently, Congress appropriated funds for the CFP and Operating Subsidy program in the 2024 Consolidated Appropriations Act.  The 2024 Appropriations Act contains additional directives to HUD regarding CFP and Operating Subsidy funding.  For instance, the Act provides for an increase in the limitation on the flexible use of CFP funds for Operating Subsidy-eligible activities, from 20 percent to 25 percent.  *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 352.

41.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose CFP and Operating Subsidy grant conditions related to prohibiting all forms of

RENNE PUBLIC LAW GROUP
Attorneys at Law

DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 2.     Multifamily Housing Service Coordinators Program Grant

42.     Congress authorized the creation of the Multifamily Housing Service Coordinators ("MFSC") program through the enactment of the National Affordable Housing Act of 1990 ("NAHA"). 42 U.S.C. § 13631(a).  Service coordinator programs received additional authority through the Housing and Community Development Act of 1992 ("HCDA").  42 U.S.C. 13632, Pub. L. 104-104, as amended.

43.     MFSC Program grants enable PHAs to fund the employment of service coordinators.  A service coordinator is defined as a social service staff person hired by a PHA.  The service coordinator's primary role is to coordinate supportive services and provide access to benefits, entitlements, and community-based resources for low-income residents.  42 U.S.C. § 8011(d)(4).  Service coordinators funded under the MFSC Program allow PHAs to support the independent living needs of elderly and disabled residents by providing services related to mental health, meals, transportation, socialization activities, and medication assistance, among other activities crucial to ensuring the health, safety, and long-term well-being of these vulnerable populations.  *Id*. § 13631(c).

44.     HUD's administration of the MFSC program is authorized and governed by statutory directives.  Congress has specified what activities are eligible for funding under the MFSC program and the eligibility requirements participants must meet to receive funds.  *See* 42 U.S.C. § 13682.

45.     Section 676 of the HCDA, 42 U.S.C. § 13632, contains Congress's overarching authorization for HUD to award MFSC grants.  Subsection (a) of that section states:

> The Secretary may make grants under this section to owners of federally assisted housing projects [in this title].  Any grant amounts shall be used for the costs of employing or otherwise retaining the services of one or more service coordinators under section 13631 of this title to coordinate the provision of any services within the project for residents of the project who are elderly families and disabled families (as such terms are defined in section 13641 of this title).

46.     Section 676 of the HCDA, 42 U.S.C. § 13632(b), provides for the HUD Secretary to establish the form and manner of applications for MFSC grants.

47.     Pursuant to the authority to establish the form and manner of funding for MFSC grant awards, HUD has issued notices of funding availability, which are renewed on an annual cycle, subject to

-12-

the availability of funds.

48.     Neither the NAHA nor the HCDA imposes any conditions on Public Housing funding related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promotion" of "gender ideology" or "elective abortion." Congress has not delegated authority that would permit an agency to adopt such conditions.

### 3.     Family Self-Sufficiency Program Grant

49.     Congress established the Family Self-Sufficiency Program ("FSSP") under Section 23 of the Housing Act.  42 U.S.C. § 1437u.  The purpose of the FSSP is to "promote the development of local strategies to coordinate use of assistance" under sections 1437f ("Low-income housing assistance") and 1437g ("Public housing Capital and Operating Funds") "with public and private resources" and to ultimately "enable eligible families to achieve economic independence and self-sufficiency."  *Id.* § 1437u; *see also id.* §§ 1437f, 1437g.

50.     FSSP grants enable PHAs to assist low-income families to achieve financial self-sufficiency through services such as case management, training, and referrals to supportive social services.

### a.     Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding Family Self-Sufficiency Grant Conditions

51.     HUD's administration of the FSSP is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the FSSP, the formula HUD must apply in allocating grants, and program requirements HUD may require recipients agree to as conditions for receiving funds.  *See* 42 U.S.C. § 1437u.

52.     Section 23 of the Housing Act, 42 U.S.C. § 1437u, contains Congress's overarching authorization for HUD to allocate FSSP grants. Subsection (i)(1) of that section states:

> Subject to appropriations, the Secretary shall establish a formula by which annual funds shall be awarded or as otherwise determined by the Secretary for the costs incurred by an eligible entity in administering the [FSSP] under this section.

53.     Section 23 of the Housing Act, 42 U.S.C. § 1437u(i)(2), provides for the HUD Secretary to establish a formula to determine FSSP funding amounts and sets forth eligibility criteria the HUD

-13-

1    Secretary shall consider to determine awards.  These considerations include the number of participants in

2    an FSSP programs and other criteria.  *Id*. at § 1437u(i)(2).

3        54.    The Housing Act does not authorize HUD to condition Capital Fund or Operating Subsidy

4    funding on opposition to all forms of Diversity, Equity, and Inclusion (DEI) policies and initiatives

5    through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless

6    immigration enforcement, exclusion of transgender people, or cutting off access to information about

7    lawful abortions.

8        55.    Pursuant to the authority to establish formulas and funding criteria under the Housing Act,

9    HUD has promulgated the Program rule at 24 C.F.R. part 984 (the "Family Self-Sufficiency Rule"),

10   which, among other things, sets forth additional conditions to which grant recipients must agree to in the

11   grant agreements they execute with HUD.  *Id*. Part 984.

12       56.    The Family Self-Sufficiency Rule does not impose any conditions on Public Housing

13   funding related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws,

14   verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective

15   abortion."  Congress has not delegated authority that would permit an agency to adopt such conditions.

16           **b.    Congress Appropriates Family Self-Sufficiency Program Grant**

17               **Funding**

18       57.    Funding for FSSP grants comes from congressional appropriations.

19       58.    Most recently, Congress appropriated funds for the FSSP program in the 2024

20   Consolidated Appropriations Act.  *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat.

21   355.

22       59.    None of the 2024 Appropriations Act's directives to HUD or any other legislation

23   authorize HUD to impose FSSP grant conditions related to prohibiting all forms of DEI, facilitating

24   enforcement of federal immigration laws, verification of immigration status, or prohibiting the

25   "promot[ion]" of "gender ideology" or "elective abortion."

26           **4.    Other HUD Grants**

27       60.    HUD and its program offices administer a range of other competitive and formula grant

28   programs that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-14-

Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other HUD grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

61.     Congress annually appropriates funding for HUD grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Secretary of HUD with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on any HUD grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1873–1876; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 734–735, 737; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat 5147–5149, 5150-5151; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 352–353, 355.

**B.      Following President Trump's Inauguration, Defendants Unilaterally Impose New Conditions on Federal Grants.**

**1.      President Trump Issues Executive Orders Directing Federal Agencies to Impose New Conditions on Federal Grants**

62.     Since taking office, President Trump has issued numerous executive orders directing the heads of executive agencies to impose conditions on federal funding that bear little or no connection to the purposes of the grant programs Congress established, lack statutory authorization, conflict with the law as interpreted by the courts, and are even at odds with the purposes of the grants they purport to amend.  Instead, the conditions appear to require federal grant recipients to agree to promote the political agenda President Trump campaigned on during his run for office and has continued espousing since, including prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Plaintiffs should not be forced to comply with these vague, unlawful, and unauthorized conditions.

63.     The "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" executive order directs each federal agency head to include "in every contract or grant award" a term that the

RENNE PUBLIC LAW GROUP
Attorneys at Law

contractor or grant recipient "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws. Exec. Order 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025). The "Ending Radical and Wasteful Government DEI Programs and Preferencing" executive order directs all agency heads to "terminate" all "'equity-related' grants or contracts." Exec. Order 14151 § 2(b)(i), 90 Fed. Reg. 8339 (Jan. 20, 2025) (together, with Exec. Order 14173, the "DEI Orders"). The certification is not limited to programs funded with federal grants. *Id*. § 3(b)(iv).

64.    The DEI Orders also direct each agency head to include a term requiring the contractor or grant recipient to agree that its compliance "in all respects" with all applicable federal nondiscrimination laws is "material to the government's payment decisions" for purposes of the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq.; § 3(b)(iv)(A). The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). Each violation of the FCA is punishable by a civil penalty of up to $27,894, plus mandatory treble damages sustained by the federal government because of that violation. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a). Given the demands of proving materiality and the severity of penalties imposed by the FCA, the certification term represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede an essential element of an FCA claim.

65.    The DEI Orders do not define the term "DEI." As explained below, subsequent executive agency memoranda and letters make clear that the Trump Administration's conception of what federal antidiscrimination law requires, including what constitutes a purportedly "illegal" DEI program, is inconsistent with the requirements of federal nondiscrimination statutes as interpreted by the courts.

66.    The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Exec. Order 14218 § 2(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025) (the "Immigration Order").

RENNE PUBLIC LAW GROUP
Attorneys at Law

67.    The Immigration Order also purports to implement the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), pursuant to which certain federal benefits are limited to individuals with qualifying immigration status.  *See* 8 U.S.C. § 1611(a).  In particular, the Immigration Order directs all agency heads to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including … PRWORA."  *Id*. § 2(i).

68.    On April 28, 2025, President Trump issued additional executive orders related to immigration and law enforcement.  The "Protecting American Communities from Criminal Aliens" executive order states that "some State and local officials … continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws" and directs the Attorney General in coordination with the Secretary of Homeland Security to identify "sanctuary jurisdictions," take steps to withhold federal funding from such places, and develop "mechanisms to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits … from private entities in a sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental entity on its behalf."  https://www.whitehouse.gov/presidential-actions/2025/04/protecting-american-communities-from-criminal-aliens/.  The "Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens" executive order directs the Attorney General to, among other things, "prioritize prosecution of any applicable violations of Federal criminal law with respect to State and local jurisdictions" whose officials "willfully and unlawfully direct the obstruction of criminal law, including by directly and unlawfully prohibiting law enforcement officers from carrying out duties necessary for public safety and law enforcement" or "unlawfully engage in discrimination or civil-rights violations under the guise of "diversity, equity, and inclusion" initiatives that restrict law enforcement activity or endanger citizens."  https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/.

69.    The "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" executive order directs agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and

RENNE PUBLIC LAW GROUP
Attorneys at Law

grantee preferences" to "ensure grant funds do not promote gender ideology." Exec. Order No. 14168 § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order"). The Gender Ideology Order states that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id*. § 2(f). It goes on to state that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id*.

70.    The "Enforcing the Hyde Amendment" executive order declares it the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (the "Abortion Order"). The Acting Director of the U.S. Office of Management and Budget (OMB) issued a memorandum to the heads of the executive agencies providing guidance on how agencies should implement the Abortion Order. Memorandum from Acting Director of OMB Matthew J. Vaeth to Heads of Executive Departments and Agencies (Jan. 24, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-12-Memorandum-on-Hyde-Amendment-EO.pdf (the "OMB Memo"). The OMB Memo told agency heads that the Trump Administration's policy is "not to use taxpayer funds to fund, facilitate, or promote abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion." *Id*. (emphasis added). The OMB Memo further instructed agency heads to "reevaluate" policies and other actions to conform with the Abortion Funding Order, audit federally funded activities suspected to contravene the Abortion Funding Order, and submit a monthly report to OMB on each agency's progress in implementing the OMB Memo. *Id*.

71.    On August 7, 2025 President Trump issued another executive order titled, Improving Oversight of Federal Grantmaking that requires that discretionary grant awards "demonstrably advance the President's policy priorities" and "shall not be used to fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient," "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  characteristic," or "any other initiatives that compromise public safety or promote anti-American values."

2  Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (the "Grantmaking Oversight Order").

3          **2.**      **HUD Attaches New Conditions to HUD Grants**

4         72.    Since President Trump's issuance of the executive orders described above and Defendant

5  Turner's confirmation as HUD Secretary, HUD has implemented President Trump's Executive Orders by

6  attaching new and unlawful conditions (collectively, the "HUD Grant Conditions") across the expansive

7  portfolio of HUD grants established by Congress; demanding grant recipients' agreement to those new

8  conditions and issuing agency-wide letters and statements about how HUD will enforce those conditions.

9          **a.**      **HUD issues new policy terms for all financial assistance incorporating**

10                      **the unlawful conditions**

11         73.    In or around April 2025, HUD amended its General Administrative, National, and

12  Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs (the "HUD

13  Policy Terms"), which set forth "various laws and policies that may apply to recipients of" HUD grant

14  awards.  This document is posted on HUD's website at https://www.hud.gov/sites/default/files/

15  CFO/documents/Administrative-Requirements-Addendum-FY2025.pdf.  Among such potentially

16  applicable policies, the document lists several of President Trump's executive orders as well as language

17  implementing those orders.

18         74.    For example, in a section labelled "Compliance with Immigration Requirements," the

19  HUD Policy Terms list the Immigration Order and summarize the potentially applicable policy:

20             No state or unit of general local government that receives HUD funding
under may use that funding in a manner that by design or effect facilitates

21             the subsidization or promotion of illegal immigration or abets policies that
seek to shield illegal aliens from deportation.

22

23         75.    Next, in a section labelled "Other Presidential Executive Actions Affecting Federal

24  Financial Assistance Programs," HUD Policy Terms state that "Recipients of Federal Awards must

25  comply with applicable existing and future Executive Orders, as advised by the Department, including

26  but not limited to . . . :" followed by a "non-exhaustive list" of nine executive orders—including the

27  Immigration Order, the Abortion Order, the DEI Orders, and the Gender Ideology Order—as

28  "applicable" conditions.  The HUD Policy Terms then summarize the potentially applicable policies

RENNE PUBLIC LAW GROUP
Attorneys at Law

reflected in those executive orders.

  a. First, the HUD Policy Terms state that the Immigration Order "prohibits taxpayer resources and benefits from going to unqualified aliens."

  b. Second, the HUD Policy Terms summarize the Abortion Order as "prohibit[ing] the use of Federal taxpayer dollars to fund or promote elective abortion."

  c. Third, the HUD Policy Terms state that the DEI Orders "require[ ] Federal agencies to terminate all discriminatory and illegal preferences" and "require[ ] the OMB Director assisted by the Attorney General and the OPM Director to coordinate the termination of all discriminatory programs and activities."

  d. Fourth, the HUD Policy Terms summarize the Gender Ideology Order as "set[ting] forth U.S. policy recognizing two sexes, male and female."

76. These requirements outlined in the HUD Policy Terms are unlawful because the requirements violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

  **b. HUD Attaches New, Unlawful Conditions to its Public Housing Operating Grants**

77. On July 17, 2025, HUD issued Notice PIH 2025-22 titled, "Public Housing Operating Subsidy Grant Eligibility Calculations and Processing for Calendar Year 2026." *See* Notice PIH 2025-22, https://www.hud.gov/sites/dfiles/OCHCO/documents/PIH_2025-22.pdf. Notice PIH 2025-22 requires public housing agencies to sign the SF-424 certification, which includes certifications to new conditions not included in CY 2025 and CY 2024 Operating Fund Processing Notices, nor authorized by the statutory provisions governing the grant programs. To receive Operating Subsidy grants, recipients must submit the SF-424 certification by October 21 at 5 p.m., Eastern Time. The PIH's Guidance regarding the Public Housing Operating Subsidy Grant includes the following conditions (collectively, the "Operating Subsidy Grant Conditions").

78. First, each recipient must "certif[y] that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964" and that it "[i]s in compliance, in all respects, with all applicable Federal anti-discrimination laws is [sic] material to

RENNE PUBLIC LAW GROUP
Attorneys at Law

the U.S. Government's payment decisions for purposes of [the False Claims Act]" (the "Operating

Subsidy Discrimination Conditions").  Although these terms and conditions do not explicitly address

diversity, equity, and inclusion ("DEI") programs, the President's DEI-related EOs and further guidance

from the Attorney General and HUD clearly imply that these new "discrimination" conditions are

intended to discourage recipients from adopting any policies or programs this Administration might label

as "DEI."  In fact, the CY2025 Annual Renewal Guidance for Multifamily Services Coordinators grant,

discussed below, includes explicit prohibitions on DEI.

79.    Second, Plaintiffs must certify that they will not use grant funding "in a manner that . . .

facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield

illegal aliens from deportation" (the "Operating Subsidy Immigration Enforcement Condition").

80.    Third, Plaintiffs are required to certify they will "administer [their] grant[s] in accordance

with all applicable immigration restrictions and requirements, including the eligibility and verification

requirements that apply under title IV of the Personal Responsibility and Work Opportunity

Reconciliation Act of 1996 . . . (U.S.C. 1601-1646) (PRWORA)."  Further, the Plaintiffs must certify

that they will comply with any future restrictions or requirements "HUD, the Attorney General, or the

U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA,

E.O. 14218, or other Executive Orders or immigration laws."  Additionally, Plaintiffs must certify that

they will "use Systematic Alien Verification for Entitlements Program (SAVE)" or any similar

verification system approved by the Federal Government to prevent "an ineligible alien who entered the

United States illegally or is otherwise unlawfully present" from receiving any Federal public benefit (the

"Operating Subsidy Immigration Status Conditions").

81.    Fourth, grant recipients are required to agree not to "use grant funds to promote 'gender

ideology,' as defined in Executive Order (E.O.) 14168" (the "Operating Subsidy Gender Ideology

Condition").

82.    Fifth, grant recipients must agree that they will "not use any grant funds to fund or

promote elective abortions, as required by [the Abortion Order]" (the "Operating Subsidy Abortion

Condition").

RENNE PUBLIC LAW GROUP
Attorneys at Law

83.     Notice PIH 2025-22 warns any Plaintiff "who knowingly submits a false claim or makes a false statement is subject to criminal and/or civil penalties, including confinement for up to 5 years, fines, and civil administrative penalties" pursuant to 18 U.S.C. §§ 287, 1001, 1010, 1012, 1014; 31 U.S.C. § 3729 (False Claims Act or "FCA"), and 3802.

84.     These Operating Subsidy Grant Conditions are unlawful; in particular, and as explained further below, the Operating Subsidy Grant Conditions violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### c.  HUD attaches a new, unlawful Immigration Condition to its Annual Contributions Contract Required for Receipt of Capital Funding

85.     On May 23, 2025, HUD published "FY2025 Capital Fund Processing Guidance for PHAs," which requires public housing agencies to sign an Annual Contributions Contract ("ACC") Amendment to access their Capital Fund award and ultimately receive the funding.  *See* FY2025 Guidance, https://www.hud.gov/sites/default/files/PIH/documents/FY25_Processing_Guidance.pdf.

86.     The ACC amendment adds a condition to FY 2025 Capital Fund Grant Awards that "[t]his grant is subject to Executive Order 14218, Ending Taxpayer Subsidization of Open Borders and applicable law" and HUD "will take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens" the "CFP Immigration Enforcement Condition").

87.     The CFP Immigration Enforcement Condition is unlawful; in particular, and as explained further below, the condition violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### d.  HUD Attaches New, Unlawful Conditions to its Service Coordinators in Multifamily Housing Grant

88.     In or around the early months of 2025, HUD published the CY 2025 Annual Renewal Guidance and the applicable CY 2025 Terms and Conditions for Service Coordinators Program in Multifamily Housing grants.  The Annual Renewal Guidance requires grantees to "carry out grant activities in compliance with the terms and conditions."  *See* Service Coordinator in Multifamily Housing Program and Congregate Housing Services Program, Calendar Year 2025 Annual Renewal Guidance.

-22-

RENNE PUBLIC LAW GROUP
Attorneys at Law

89.     In or around the early months of 2025, HUD published the CY 2025 Annual Renewal Guidance ("MFSC Guidance"). *See* CY 2025 Annual Renewal Guidance, https:// www. hud. gov/sites/ dfiles/Housing/documents/CY25-MFSC-CHSP-Annual-Renewal-Guidance.pdf.

90.     In or around the early months of 2025, HUD also published the CY 2025 Terms and Conditions for Service Coordinators in Multifamily Housing Program grants ("MFSC Terms and Conditions"). *See* CY 2025 Terms and Conditions for Service Coordinators in Multifamily Housing Program, https://www.hud.gov/sites/dfiles/Housing/documents/CY25-MFSC-CHSP-Terms-Conditions.pdf.

91.     The MFSC Guidance requires grantees to "carry out grant activities in compliance with the terms and conditions."  The MFSC Guidance and Terms and Conditions documents set forth the following conditions (collectively, the "MFSC Grant Conditions"):

92.     The MFSC Guidance explicitly requires grantees to comply with all of the EOs at issue, including EO 14218 Ending Taxpayer Subsidization of Open Borders, EO 14182 Enforcing the Hyde Amendment, EO 14173 Ending Illegal Discrimination and Restoring Merit-Based Opportunity; EO 14168 Gender Ideology; and EO 14151 Ending DEI Programs and Preferencing.  (the "MFSC EO Condition").

93.     The first page after the CY2025 Terms and Conditions table of contents includes the EOs and conditions listed in the Renewal Guidance.  The EOs and conditions are listed again under "Article X- Certifications."

94.     Plaintiffs are also made responsible to ensure "compliance [with the EOs] by any other entity(ies) to which it makes grant funds available."  The MFSC Guidance also warns that "[f]ailure to comply will be a basis for denial of any additional grant funds."

95.     The MFSC Guidance requires recipients to "certif[y] that it does not operate any programs promoting Diversity, Equity, and Inclusion (DEI) that violate any applicable Federal anti-discrimination laws."  The MFSC Guidance further requires the recipient to agree that "[b]y accepting the grant renewal, the grantee agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for the purposes of section 3729(b)(4) of title 31, United States Code" (the "MFSC Discrimination Conditions").

-23-

RENNE PUBLIC LAW GROUP
Attorneys at Law

96.    In addition, the MFSC Guidance states "grantees have an obligation to ensure that grant monies and benefits do not go to unqualified aliens" (the "MFSC Immigration Status Condition").

97.    The MFSC Grant Conditions are unlawful; in particular, and as explained further below, the PIH Grant Conditions violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### e.    HUD Attaches New, Unlawful Conditions to its Family Self-Sufficiency Grant

98.    On September 26, 2025, HUD issued Notice PIH 2025-24 with subject title "FY 2025 Family Self-Sufficiency Grant Program Annual Funding Notification and Application Process."

99.    The Notice includes section "XI. PRESIDENTIAL EXECUTIVE ACTIONS AFFECTING FEDERAL FINANCIAL ASSISTANCE PROGRAMS" which states that grantees must make sure grant funded activities "comply with applicable existing and future executive orders and other Presidential Actions."  This Notice lists the same EOs and unlawful conditions imposed on the MFSC grant (the "FSSP EO Condition").

100.    The FSSP EO Conditions are unlawful; in particular, and as explained further below, the FSSP EO Conditions violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 3.    The New Grant Conditions Implementing and Incorporating the Executive Orders Are Unlawful

### a.    Incorporation of the Executive Orders Is Unlawful

101.    The conditions discussed above purport to incorporate executive orders as governing the use of federal funds.  These orders in many ways purport to adopt new laws by presidential fiat, amend existing laws, and overturn court precedent interpreting laws.  In so doing, the new grant conditions seek to usurp Congress's prerogative to legislate and its power of the purse, as well as the judiciary's power to say what the law means.

102.    Furthermore, the executive orders are the President's directives to federal agencies.  These orders are unintelligible and vague as applied to grant recipients, and as implemented in the unlawful conditions at issue.

RENNE PUBLIC LAW GROUP
Attorneys at Law

103.    Without Congress passing his policy agenda, President Trump purports to have granted himself unchecked Article II powers to legislate by executive order and impose his decrees on state and local governments seeking grant funding.

### b.    The Discrimination Conditions Are Unlawful

104.    While Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding in the past, the Trump Administration's DEI Order and subsequent communications to federal grant recipients make clear that Defendants seek compliance with the Trump Administration's novel, incorrect, and unsupported interpretation of federal nondiscrimination law as barring any and all DEI programs.  The Trump Administration's conception of an "illegal" DEI program is contrary to actual nondiscrimination statutes and is inconsistent with what any court has endorsed when interpreting them.

105.    For instance, a February 5, 2025 letter from Attorney General Pam Bondi to DOJ employees states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on race or sex"—potentially reaching affinity groups or teaching about racial history.  Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025), https: //www. justice. gov/ag/media/ 1388501/dl?inline.

106.    Defendant Turner has stated that "HUD is carrying out President Trump's executive orders, mission, and agenda," by "[a]lign[ing] all programs, trainings, and *grant agreements* with the President's Executive Orders, removing diversity, equity, inclusion (DEI)."  Press Release No. 25-059, *HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days*, https:// www. hud. gov/news/hud-no-25-059 (emphasis added).

107.    Neither the text of Title VI nor any other statute or other condition enacted by Congress prohibits recipients of federal funding from considering issues of diversity, equity, or inclusion.  The law, in fact, requires public housing agencies to certify they "will affirmatively further fair housing" (42 U.S.C. § 1437c-1(d)(16)) and designate housing and other social services resources specifically for residents with disabilities and the elderly.  42 U.S.C. § 8011(a).  The Supreme Court has never interpreted Title VI to prohibit diversity, equity, and inclusion programs.  Indeed, existing case law

RENNE PUBLIC LAW GROUP
Attorneys at Law

rejects the Trump Administration's expansive views on nondiscrimination law with respect to DEI. The President has no authority to declare, let alone change, federal nondiscrimination law by executive fiat. Yet, the Discrimination Condition seeks to impose the Administration's views on DEI as if they were the law by using federal grant conditions and the threat of FCA enforcement to direct and coerce federal grant recipients into acquiescing in the Administration's unorthodox legal interpretation of nondiscrimination law.

108.    The inconsistency between the Administration's interpretation of nondiscrimination law and legal precedent raises serious questions about what meaning and scope Defendants intend the Discrimination Condition to carry, leaving Plaintiffs to guess at what conduct Defendants would deem to violate federal antidiscrimination law, and forcing Plaintiffs to self-censor by "steer[ing] far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up).

109.    Accepting these conditions would therefore risk potential enforcement action by Defendants, backed by the FCA's steep penalties, if they refuse to align their activities with President Trump's political agenda. This threat is intensified by the grant conditions that purport to have recipients concede the DEI certification's "materiality"—an otherwise "demanding" element of an FCA claim. Further, even short of bringing a suit, the FCA authorizes the Attorney General to serve civil investigative demands on anyone reasonably believed to have information related to a false claim—a power that could be abused to target grant recipients with DEI initiatives the Trump Administration disapproves of. *See* 31 U.S.C. § 3733.

110.    The FCA is intended to discourage and remedy fraud perpetrated against the United States—not to serve as a tool for the Executive to impose unilateral changes to nondiscrimination law, which is instead within the province of Congress in adopting the laws and the Judiciary in interpreting them. Requiring recipients to certify that compliance "in all respects with all applicable Federal anti-discrimination laws" is always "material" for purposes of FCA imposes an impermissibly vague standard that is broader than the statute allows.

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

### c.    The Immigration Enforcement Condition Is Unlawful

111.    Congress has not delegated to Defendants the authority to condition grant funding on a recipient's agreement not to "promot[e] . . . illegal immigration" or "abet[] policies that seek to shield illegal aliens from deportation."  It is also unclear what type of conduct this might encompass, leaving federal grant recipients without fair notice of what activities would violate the prohibition and giving federal agencies free rein to enforce it arbitrarily.

112.    Indeed, on April 24, 2025, Judge William H. Orrick of the United States District Court for the Northern District of California preliminarily enjoined the federal government from "directly or indirectly taking any action to withhold, freeze, or condition federal funds from" sixteen cities and counties on the basis of Section 2(a)(ii) of the Immigration Order, which directs that no "Federal payments" be made to states and localities if the "effect," even unintended, is to fund activities that the Administration deems to "facilitate" illegal immigration or "abet so-called 'sanctuary' policies."  *City & Cnty. of San Francisco v. Trump*, 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025). The court ruled that the direction "to withhold, freeze, or condition federal funding apportioned to localities by Congress, violate[s] the Constitution's separation of powers principles and the Spending Clause" and "violate[s] the Fifth Amendment to the extent [it is] unconstitutionally vague and violate[s] due process."  *Id*. at *2.

### d.    The Immigration Status Condition Is Unlawful

113.    Further, PRWORA does not authorize the Immigration Status Condition for at least two reasons.  First, PRWORA explicitly does not require states to have an immigration status verification system until twenty-four months after the Attorney General promulgates certain final regulations.  8 U.S.C. § 1642(b).  Those regulations must, among other things, establish procedures by which states and local governments may verify eligibility and procedures for applicants to prove citizenship "in a fair and nondiscriminatory manner."  *Id*. § 1642(b)(ii), (iii).  The Attorney General has issued interim guidance and a proposed verification rule, but has not implemented a final rule.  *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule).  This

-27-

1  failure to promulgate a final regulation left in place DOJ's Interim Guidance, which requires only the

2  examination of identity and immigration documentation. 62 Fed. Reg. at 61348–49. Absent

3  implementing regulations, Plaintiffs are not required to verify participants' immigration status using

4  SAVE or an equivalent verification system. *See* 42 U.S.C. § 1320b-7. Requiring recipients to do so

5  exceeds the authority created in PRWORA.

6      114.    Second, SAVE is a database operated by the U.S. Department of Homeland Security,

7  acting through U.S. Citizenship and Immigration Services, that is sometimes used to assist federal

8  immigration enforcement actions. The Immigration Status Condition would require Plaintiffs to gain

9  access to this system, train their own employees how to use the system, and require them to enter

10  immigration information. Such an effort to commandeer local resources for matters related to federal

11  immigration enforcement is counter to federal law, as well as applicable local and state laws precluding

12  local participation in federal immigration enforcement.

13      115.    Furthermore, Congress has legislated a different immigration status verification regime

14  applicable to the grant programs at issue through section 214 of the Housing and Community

15  Development Act of 1980 (42 U.S.C. § 1436a). For example, the existing verification regime

16  specifically provides public housing eligibility for mixed-status households. 42 U.S.C. § 1436a(b)(2).

17  Defendants' unauthorized attempt to impose the Immigration Status Conditions conflicts with the

18  Congressionally enacted verification regime that already exists.

19          **e.    The Gender Ideology Condition Is Unlawful**

20      116.    The Gender Ideology Condition improperly seeks to force federal grant recipients to no

21  longer recognize transgender, gender diverse, and intersex people by restricting funding that promotes

22  "gender ideology." This violates federal discrimination law, which recognizes that transgender

23  individuals are a protected category under provisions of the Civil Rights Act. *See, e.g., Bostock v.*

24  *Clayton Cnty., Georgia*, 590 U.S. 644, 683 (2020); *Roe v. Critchfield*, 137 F.4th 912, 928 (9th Cir. 2025);

25  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020); *A.C. by M.C. v. Metro. Sch.*

26  *Dist. of Martinsville,* 75 F.4th 760, 769 (7th Cir. 2023).

27      117.    The Gender Ideology Condition is also vague. The definition of "gender ideology" is not

28  only demeaning but also idiosyncratic and unscientific. Further, given the expansive meaning of

RENNE PUBLIC LAW GROUP
Attorneys at Law

"promote," federal agencies have free rein to punish recipients who merely collect information on gender identity, which has long been authorized and encouraged by HUD in its binding regulations, as such information can be used to improve the quality and efficacy of housing services.

118.    The Trump Administration has already terminated federal funding as a result of agency action carrying out the Gender Ideology Order and related executive orders.  For example, one of the largest free and reduced-cost healthcare providers in Los Angeles reported that the U.S. Centers for Disease Control and Prevention (CDC) terminated a $1.6 million grant that would have supported the clinic's transgender health and social health services program.  The CDC ended the grant in order to comply with the Gender Ideology Order.  *See* Kristen Hwang, LA clinics lose funding for transgender health care as Trump executive orders take hold, Cal Matters (Feb. 4, 2025), https://calmatters.org/health/2025/02/trump-executive-order-transgender-vhealth/.

119.    On February 28, 2025, Judge Lauren King of the United States District Court for the Western District of Washington enjoined enforcement of the Gender Ideology Order in part (including parts the Gender Ideology Condition it incorporates by references), holding that the plaintiffs had shown a likelihood of success on their claims that the Order violates the Fifth Amendment's guarantee of equal protection and the separation of powers.  *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261-77 (W.D. Wash. 2025).[2]

120.    Particularly relevant here, the Court ruled that the plaintiffs were likely to succeed in showing that "[b]y attaching conditions to federal funding that were . . . unauthorized by Congress," subsections 3(e) and (g) of the Gender Ideology Order "usurp Congress's spending, appropriation, and legislative powers."  *Id*. at *1261.  The Court explained that the Gender Ideology Order "reflects a 'bare desire to harm a politically unpopular group'" by "deny[ing] and denigrat[ing] the very existence of transgender people."  *Id*. at 1277 (citation omitted).

---

[2] In *Trump v. CASA, Inc*., the Supreme Court held that universal injunctions likely exceeded the equitable authority of federal courts, and thus overturned universal injunctions to the extent that they were broader than necessary to afford relief to plaintiffs.  *See* 606 U.S. 831, 833 (2025).  The injunction issued in *Washington* remains in effect as to enforcement against specific plaintiffs.

RENNE PUBLIC LAW GROUP
Attorneys at Law

#### f.    The Abortion Condition is Unlawful

121.    The Abortion Condition (including the Abortion Order incorporated by reference) does not implement, but rather exceeds, the Hyde Amendment's narrow prohibition on using federal funds to pay for, or require others to perform or facilitate, abortions.  While it purports to apply the Hyde Amendment—a provision that has been enacted in successive appropriations acts that limits the use of federal funds for abortions (subject to narrow exceptions)—in reality, it goes well beyond the Hyde Amendment.  The Hyde Amendment to the 2024 Appropriations Act specifically and narrowly prohibits the use of appropriated funds to "require any person to perform, or facilitate in any way the performance of, any abortion" or to "pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape or incest."  Pub. L. 118-42, §§ 202, 203, 138 Stat. 25 (March 9, 2024).  In contrast, the Abortion Condition attempts to prohibit grantees from using federal funds to "fund or promote elective abortions" in all contexts, extending the restriction beyond the narrow prohibitions of the Hyde Amendment and imposing obligations on recipients not contemplated by Congress.  Furthermore, the Hyde Amendment to the 2024 Appropriations Act does not require grant recipients to refrain from "promot[ing] abortion"—a vague prohibition that is susceptible to arbitrary enforcement.  And in doing so, the Abortion Condition usurps Congress's spending, appropriations, and legislative power.  In sum and as further explained below, Defendants' imposition of the Abortion Condition violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

122.    In sum and as further explained below, Defendant's imposition of the HUD Grant Conditions violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### C.    Plaintiffs Face an Impossible Choice of Accepting Illegal Conditions, or Forgoing Federal Grant Funding for Critical Programs and Services

123.    The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's choice of accepting illegal conditions that are unauthorized by Congress, violate the Constitution, and are accompanied by poison pill provisions that increase the risk of FCA claims, or forgoing the grant funds—funds paid (at least partly) through local federal taxes—that are essential for vital local services.

RENNE PUBLIC LAW GROUP
Attorneys at Law

The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to budget and plan for services covered by the grants.

124.    The heightened FCA risk is not merely speculative.  A May 19, 2025, letter from Deputy Attorney General Todd Blanche to certain DOJ divisions and offices and all U.S. Attorneys states that DOJ is setting up a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws."  The letter asserts the FCA "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin."  It further states that the Civil Fraud Section and Civil Rights Division will "engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients" (including HUD) and "will also establish partnerships with state attorneys general and local law enforcement to share information and coordinate enforcement actions."  Finally, the letter states that DOJ "strongly encourages" private lawsuits under the FCA and "encourages anyone with knowledge of discrimination by federal-funding recipients to report that information to the appropriate federal authorities so that [DOJ] may consider the information and take any appropriate action."  Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S. Attorneys (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl?inline.

125.    Withholding Operating Subsidy grants from Plaintiffs could result in a loss of millions of dollars in funding for housing and other services that Plaintiffs have adopted to meet the basic needs of their residents.

126.    The loss of these federal funds would be a significant blow to Plaintiffs' finances, such that the essential services it provides would be seriously compromised, if not altogether halted.  Plaintiffs cannot replace these funds with local revenue without drastically cutting other critical services or abandoning their obligations to vulnerable populations.  The loss of these funds would prevent Plaintiffs from serving their residents, leading to a loss of access to housing, healthcare, counseling, and other assistance.  This funding represents a significant percentage of those Plaintiffs' total budgets for housing

RENNE PUBLIC LAW GROUP
Attorneys at Law

-31-

and community support programs, including community development, affordable housing creation, and rehabilitation.  The loss of this funding would have devastating effects on Plaintiffs and their residents.

127.    Yet agreeing to the vague, unauthorized, and contradictory grant conditions—even if Plaintiffs were to make a good faith effort to revise their policies to comply—would expose them to significant liability.  Certifying compliance with these conditions carries an intolerable risk of enforcement under the False Claims Act, and constitutional and statutory challenges from stakeholders who could assert that Plaintiffs have adopted discriminatory or otherwise unlawful policies in violation of their rights.  Plaintiffs thus face an impossible dilemma: either accept the unlawful conditions and the legal jeopardy they create, or forfeit funding that is essential to the health, safety, and well-being of their residents.

## V.    CAUSES OF ACTION

### Count 1: Separation of Powers

128.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

129.    The Constitution "exclusively grants the power of the purse to Congress, not the President."  *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."  *Id*. (second alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

130.    The Constitution vests Congress—not the Executive—with legislative powers, see U.S. Const. art. 1, § 1, the spending power, see U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, see U.S. Const. art. 1, § 9, cl. 7.  Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

131.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'"  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id*., No. 51, at 350).

-32-

RENNE PUBLIC LAW GROUP
Attorneys at Law

132.    "As Chief Justice Marshall put it, this means that 'important subjects … must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'"  *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

133.    The separation of powers doctrine thus represents perhaps the central tenet of our Constitution.  *See, e.g., Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24; *Seila Law LLC*, 591 U.S. at 227; *see also Clinton v. City of New York*, 524 U.S. 417, 450 (1998) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers" (Kennedy, J., concurring)).  Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

134.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate."  *City & Cnty. of S.F.*, 897 F.3d at 1234.  Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments.  2 U.S.C. §§ 681 et seq.  The President has not done so.

135.    Congress has not conditioned the provision of Defendants' grants on compliance with a prohibition on all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  Nor has Congress delegated to Defendants the authority to attach the HUD Grant Conditions unilaterally.

136.    By imposing the HUD Grant Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

137.    Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function."  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–13 (2024) (internal quotations omitted).

138.    Here, Defendants seek to impose conditions that purport to require compliance with the law interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the Judiciary's interpretation of the law's meaning.

-33-

139.    For these reasons, Defendants' conditioning of grants on compliance with the HUD Grant Conditions violates the separation of powers doctrine.

### Count 2: Spending Clause

140.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

141.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States …"  U.S. Const. art. I, § 8, cl. 1.

142.    As described above, Defendants violate the separation of powers because the HUD Grant Conditions are neither expressly nor impliedly authorized by Congress.  For the same reasons, Defendants violate the Spending Clause.

143.    The Spending Clause also requires States to have fair notice of conditions that apply to federal funds disbursed to them.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously."  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

144.    Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.  *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

145.    Even if Congress had delegated authority to the Executive and HUD, to condition grant funding on terms prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion.", the HUD Grant Conditions would violate the Spending Clause by:

a.    imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17;

c.    imposing conditions that have no nexus to the federal interest in providing safe and affordable housing to individuals deemed eligible under the Housing and Community Development Act, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be

RENNE PUBLIC LAW GROUP
Attorneys at Law

illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"); and

d.     with respect to the prohibition on promotion of "gender ideology," imposing a condition that purports to require grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex, *see id.* at 210.

#### Count 3: Fifth Amendment Due Process – Vagueness

146.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

147.     Under the Due Process Clause of the Fifth Amendment, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).

148.     The HUD Grant Conditions are unconstitutionally vague.

149.     The EO Conditions are vague in purporting to incorporate executive orders.  Executive orders are the President's directives to federal agencies and do not apply to federal grant recipients.  The requirement that Plaintiffs comply with executive orders in their use of grant funds renders these grant conditions vague.

150.     The Discrimination Conditions fail to clearly define what conduct is prohibited and fail to specify clear standards for enforcement.  This uncertainty is amplified by agency letters and statements, including the Bondi Letter and Turner statements, that conflict with federal statutes and case law.

151.     The Immigration Enforcement Condition (which incorporates by reference the Immigration Order) fails to define the terms "facilitates," "subsidization," or "promotion" with respect to "illegal immigration," leaving federal grant recipients without fair notice of what would violate the prohibition.

152.     The definition of "gender ideology" adopted in the Gender Ideology Condition is so vague as to require people of ordinary intelligence to guess as to what is prohibited.  By the same token, the Gender Ideology Condition affords unfettered discretion to Defendants to determine, based on their subjective interpretation, whether a federal grant is used to "promote gender ideology."

153.    The Abortion Condition's prohibition on "promot[ing] elective abortion" is also vague, leaving federal grant recipients without fair notice of what activities would violate the prohibition and affording Defendants unfettered discretion.

154.    The vague terms and conditions described above are likely to chill individuals from engaging in First Amendment-protected speech on matters of public concern.

155.    Thus, the HUD Grant Conditions are unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

## Count 4: Administrative Procedure Act, 5 U.S.C. § 706(2) –
## Arbitrary and Capricious

156.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

157.    Defendant HUD is an agency as defined in the APA, 5 U.S.C. § 551(1).  Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

158.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Id*. (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).  "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action.  *Id*. at 293.  Furthermore, the standard is more exacting when an agency changes positions or "'is not writing on a blank slate.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020) (citation omitted).  "[L]ongstanding policies may have engendered serious reliance interests that must be taken into account."  *Id*. at 1915 (cleaned up).  Accordingly, when changing its position, an agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Id*.  It is "arbitrary and capricious to ignore such matters."  *Id*.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-36-

159.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

160.    The internal HUD guidance imposing the challenged conditions are all final agency actions subject to review under the APA.  These actions include but are not limited to the April 2025 amendments to the HUD Policy Terms, the July 17, 2025, Notice PIH 2025-22, the May 23, 2025, FY2025 Capital Fund Processing Guidance for PHAs, the CY 2025 Annual Renewal Guidance and the applicable CY 2025 Terms and Conditions for Multifamily Housing Service Coordinators Program grants, and the September 26, 2025, Notice PIH 2025-24.

161.    These actions are final because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving federal HUD funds.  *See State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018) (holding that agency decision to impose new conditions on federal grants satisfies both tests for final agency action because it "articulate[s] that certain funds" will "require adherence to the" new conditions and "opens up the [recipient] to potential legal consequences," including withholding of funds if the recipient declines to accept the conditions); *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same).  These actions determine rights and obligations and produce legal consequences because they exercise purported authority to create new conditions on already awarded funds that would obligate recipients to comply with the Executive's policy priorities.

162.    HUD has provided no reasoned explanation for its decision to impose conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, and prohibiting the "promot[ion]" of "gender ideology" and "elective abortion" on HUD funds that have no connection to those issues.

163.    HUD has provided no reasoned basis for imposing the HUD Grant Conditions, except to the extent HUD is enacting the President's policy desires, as expressed in the above-referenced Executive Orders, in place of Congress's intent.

-37-

164.     HUD also ignores essential aspects of the "problem" it purports to address via the PIH programs, including the Plaintiff's reasonable and inevitable reliance on now at-risk funds, the expectation of reimbursement from already appropriated funds, and the potential impacts on low-income and homeless individuals and families who may be dissuaded from accepting services if they must verify their immigration status or are unable to use their identified gender in doing so.

165.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the HUD Grant Conditions violate the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 5: Administrative Procedure Act, 5 U.S.C. § 706(2) – Contrary to the Constitution

166.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

167.     Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

168.     As described above, Defendants' imposition of the HUD Grant Conditions violates bedrock constitutional provisions and principles, including the separation of powers between the President and Congress, the Spending Clause, and the Fifth Amendment.

169.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the HUD Grant Conditions violate the APA because it is contrary to constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 6: Administrative Procedure Act, 5 U.S.C. § 706(2) – In Excess of Statutory Authority

170.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

RENNE PUBLIC LAW GROUP
Attorneys at Law

171.    Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

172.    Defendants may exercise only the authority granted to them by statute or the Constitution.

173.    No law or provision of the Constitution authorizes Defendants to impose extra- statutory conditions not authorized by Congress on congressionally-appropriated funds.

174.    Neither the Housing Act of 1937 nor any other legislation authorizes HUD to impose conditions on HUD grant funding related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

175.    Moreover, the challenged HUD Grant Conditions contradict and conflict with existing statutory requirements that requires PHAs to "affirmatively further fair housing," designate housing and other social services resources specifically for residents with disabilities and the elderly, recognize transgender individuals as a protected category under provisions of the Civil Rights Act, and establish an already existing immigration status verification regime through section 214 of the Housing and Community Development Act of 1980 (42 U.S.C. § 1436a).

176.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the HUD Grant Conditions violates the APA because it is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 7: Administrative Procedure Act, 5 U.S.C. § 706(2) –
### Agency Action Without Procedure Required By Law

177.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

178.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

RENNE PUBLIC LAW GROUP
Attorneys at Law

179.    An agency "must abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990).

180.    HUD has adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants." 24 C.F.R. § 10.1 ("It is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts . . . ."); 24 C.F.R. § 10.2 (definition of "rule"); 24 C.F.R. §§ 10.7–10.10 (notice-and-comment procedures); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447, 448 (9th Cir. 1994).

181.    Through the HUD Grant Conditions, HUD has not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but also attached new conditions on federal grant programs that require grant recipients to comply with various Administration directives as a condition to receiving federal funds.  These new conditions thus comprise a substantive rule, not an interpretive rule or general statement of policy.  *See, e.g.*, *Yesler Terrace Cmty. Council*, 37 F.3d at 449 ("Substantive rules … create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (explaining that a rule is substantive, i.e., "legislative," inter alia, if there is no "adequate legislative basis for enforcement action" without the rule, or if the rule "effectively amends a prior legislative rule").

182.    In imposing the HUD Grant Conditions, HUD failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe the procedure required by law.

183.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the HUD Grant Conditions violate the APA because it is without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

RENNE PUBLIC LAW GROUP
Attorneys at Law

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

A.      A declaration that the HUD Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

B.      A declaration that Defendants' attachment or incorporation of the HUD Grant Conditions to Plaintiffs' funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

C.      An order temporarily restraining, and preliminarily and permanently enjoining Defendants and their program offices from imposing or enforcing the HUD Grant Conditions or any materially similar terms or conditions to any application submitted by Plaintiffs, and any funds awarded or received by Plaintiffs, directly or indirectly;

D.      An order pursuant to 5 U.S.C. § 705 that postpones the effective date or any action by any Defendants to adopt, issue, or enforce the HUD Grant Conditions pending conclusion of this litigation; declares the HUD Grant Conditions void and unenforceable with respect to any application, award, agreement or other document executed by Plaintiffs; and declares that the Discrimination Conditions require compliance with the statutes cited therein as those statutes have been enacted by Congress and interpreted by the judiciary.

E.      An order under 5 U.S.C. § 706 holding unlawful, setting aside, and vacating all actions taken by Defendants to:  adopt, issue, or implement the HUD Grant Conditions; require, attach, incorporate, implement, or enforce the HUD Grant Conditions at any stage of the grant process, including but not limited to any grant application or grant agreement or subagreement; construe the Discrimination Conditions to require anything other than compliance with the statutes cited in the Discrimination Conditions as they have been enacted by Congress and interpreted by the judiciary.

F.      Orders preliminarily and permanently enjoining Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiffs' participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or to any state agency through which Plaintiff may receive grant funding; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  issue, process, sign, or approve any notice or request for payment, or reducing the amount of such

2  approval or payment;

3        G.      Award Plaintiffs their reasonable costs and attorneys' fees; and

4        H.      Grant any other further relief that the Court deems just and proper.

5

6  Dated:  October 15, 2025                RENNE PUBLIC LAW GROUP

7

8  By: _____ */s/ Jonathan V. Holtzman* _____
      JONATHAN V. HOLTZMAN

9  Attorneys for Plaintiffs

10  HOUSING AUTHORITY OF THE COUNTY
OF SAN DIEGO; HOME FORWARD;

11  HOUSING AUTHORITY OF THE CITY OF
LOS ANGELES; LOS ANGELES COUNTY

12  DEVELOPMENT AUTHORITY; HOUSING
AUTHORITY OF THE CITY OF SALEM;

13  HOUSING AUTHORITY OF BALTIMORE
CITY; SAN DIEGO HOUSING COMMISSION

14

15  Dated:  October 15, 2025                SAN FRANCISCO CITY ATTORNEY'S
OFFICE

16

17  By: _____ */s/ David Chiu* _____
      DAVID CHIU

18

19  Attorney for Plaintiff
HOUSING AUTHORITY OF THE CITY AND
COUNTY OF SAN FRANCISCO

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

RENNE PUBLIC LAW GROUP
Attorneys at Law

**ECF ATTESTATION**

I, JONATHAN V. HOLTZMAN, am the ECF user whose identification and password are being used to file this FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

Dated: October 15, 2025                                    RENNE PUBLIC LAW GROUP


By: _____*/s/ Jonathan V. Holtzman*_____
      JONATHAN V. HOLTZMAN

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF